UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 CR 376 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| STEVEN FENZL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On September 28, 2010, a jury returned a guilty verdict against Steven Fenzl ("Fenzl") on

a four-count indictment charging him with various mail and wire fraud offenses in violation of

18 U.S.C. §§ 1341, 1343 and 1349. Presently before the Court is Fenzl's post-trial motion

seeking acquittal or a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. (R.

110, Def.'s Mot. at 9.) For the reasons stated herein, the motion is denied.

## BACKGROUND

Fenzl was part-owner and vice-president of Urban Services ("Urban"), an Illinois

corporation engaged in the business of refurbishment and repair of refuse disposal containers.

(R. 1, Indictment ¶¶ 2-4.) On April 21, 2009, Fenzl and his business partner, Douglas Ritter[1]

("Ritter"), were indicted. (*Id.*) The indictment charged Fenzl and Ritter with one count of

conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 (Count I); two counts

of mail fraud in violation of 18 U.S.C. § 1341 (Counts II and IV); and one count of wire fraud in

violation of 18 U.S.C. § 1343 (Count III). (*Id.*) The government alleged that Fenzl engaged in a

scheme to defraud the City of Chicago (the "City") of money and property related to bids

---

[1] On June 3, 2010, Ritter pled guilty to Count I of the Indictment. (R. 60, Plea Agreement.)

submitted for, and the performance of, Specification No. 17390A (the "Refurb Contract" or the "Contract"), to repair and refurbish the City's refuse disposal containers. (*Id.*) According to the indictment, in addition to submitting a bid for Urban, Fenzl, Ritter, and Urban employee Mona Fakhoury ("Fakhoury") (collectively, the "coconspirators") orchestrated the submission of "sham" bids by three other companies—Uniqued, Roto Industries, and Veronica Contracting—with "materially false and fraudulent" documents. (*Id.* ¶ 25.) In addition to the bid rigging scheme, the government also alleged that Fenzl and his coconspirators fraudulently obtained the Refurb Contract, in part, by certifying that Urban would subcontract for goods or services from Chicago Contract Cleaning, a certified Minority Business Enterprise ("MBE"), and Veronica Contracting, a certified Women Business Enterprise ("WBE"), when in fact they did not intend to obtain such goods or services. (*Id.* ¶¶ 27, 52-64.)

Between September 21 and 24, 2011, the Court presided over a four-day trial. At trial, the government presented evidence in support of Fenzl's charged conduct, which included: (1) the testimony of Fakhoury; (2) the testimony of Roto Industries employees Mark Rangel ("Rangel") and Kerry Holmes ("Holmes"); (3) the testimony of Suzanne Caruso ("Caruso"), the owner of Veronica Contracting; (4) the testimony of Lucia Chavez de Hollister ("de Hollister"), the owner of Chicago Contract Cleaning; (5) the testimony of Investigator Kristopher Brown ("Investigator Brown") of the City's Office of Investigator General; (6) the testimony of Michele Price-Haynes of the City of Chicago's Department of Finance; (7) various emails and phone bills documenting contact between Fenzl and Ritter; and (8) documents related to the bids submitted for the Refurb Contract.

At trial, it was undisputed that Urban had previously been awarded garbage cart

2

refurbishment contracts with the City and, in the case of the 2005 Refurb Contract, was the lowest bidder in the bid process and was awarded the Contract. The parties also stipulated to certain facts about negative news coverage Urban had received in the Chicago Tribune in 2004. The City had received an anonymous complaint about Ritter, which ultimately led to an investigation of Ritter and Urban and the Chicago Tribune article. In July 2005, the City's Inspector General closed the investigation into Ritter and Urban.

Because of the bad press and the Inspector General's investigation, Ritter and Fenzl believed that Urban would not be awarded the Refurb Contract even if Urban was the lowest qualified bid. Thus, Fenzl argues, they began exploring "alternatives for getting some other company to take over its substantial facilities and equipment, in which Urban had invested a great deal of money, should the City refuse to give Urban the contract even if [it] submitted the lowest and best bid." (R. 110, Def.'s Mot. at 4-5.) The government, on the other hand, contended that Fenzl and his coconspirators sought to ensure, through the use of "various material false pretenses, representations, and promises and concealment of material facts," that "if the City of Chicago did not award the [Refurb] contract" to Urban, the City would "award the [Refurb] contract to a company under the control or influence of" Fenzl and his coconspirators. (R. 1, Indictment ¶ 24.)

After two days of deliberations, the jury convicted Fenzl on all four counts. Fenzl now brings a motion for judgment of acquittal or a new trial. He argues that he is entitled to a judgment of acquittal because the government's evidence was insufficient to support the jury's verdict. (R. 110, Def.'s Mot. at 2.) Alternatively, Fenzl seeks a new trial based on the admission of "improper and highly prejudicial testimony offered by the government." (*Id.*)

## ANALYSIS

### I.  Motion for a judgment of acquittal

Fenzl argues that he is entitled to a judgment of acquittal because there was insufficient evidence to prove all elements of the offenses charged beyond a reasonable doubt. (R. 110, Def.'s Mot. at 2.)  Under Federal Rule of Criminal Procedure 29, a court may set aside a guilty verdict and enter a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29.  When making a determination under Rule 29, "the court considers the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor." *United States v. Aldridge*, No. 09-2520, 2011 WL 1518834, at *5 (7th Cir. Apr. 22, 2011) (internal quotation marks and citation omitted).  In challenging the sufficiency of the evidence, Fenzl "bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2004).  When conducting this review of the evidence, the Court "do[es] not weigh the evidence or assess the credibility of witnesses." *United States v. Howard*, 619 F.3d 723, 726-27 (7th Cir. 2010) (internal quotation marks and citations omitted).  "As long as a rational trier of fact could have returned a guilty verdict, the verdict will be affirmed." *Warren*, 593 F.3d at 546.

As a preliminary matter, the Court must clarify the disputed issue of what exactly the government alleged in the indictment.  Fenzl claims that the indictment charged him with committing mail and wire fraud by: "(1) 'fraudulently certifying' in Urban Services bid to the City that they 'had not entered into any agreement with any other bidder [on the subject contract] relating to the price named in any other proposal submitted to the City of Chicago [on the Refurb contract]'; and (2) 'fraudulently certifying to the City of Chicago on Urban Services bid that

4

Urban 'intended to purchase goods or services from' a [WBE] and a[n] [MBE]." (R. 111, Def.'s Mot. at 1-2, citing R. 1, Indictment ¶¶ 26-27.) The government, however, points out that Fenzl has overlooked a third "general means" through which the fraud was accomplished as identified in paragraph 25 of the indictment. (R. 113, Govt. Resp. at 4.) The Court agrees.

According to the indictment, all four counts in the indictment are based on a single scheme to defraud the City through multiple means. The three general means are set forth in paragraphs 25 through 27, and essentially state that:

> (1) Fenzl and Ritter deceived the City about the number of legitimate bids submitted for the Refurb Contract by orchestrating the submission of "sham" bids by three other companies with "materially false and fraudulent" documents (*id.* ¶ 25);
>
> (2) Ritter falsely and fraudulently certified in Urban's bid for the Refurb Contract that they had not entered an agreement with any other bidder relating to the price named in any other proposal submitted to the City or an arrangement or agreement that would otherwise restrain free competition (*id.* ¶ 26);
>
> (3) Ritter falsely and fraudulently certified that Urban intended to purchase goods or services from a WBE and an MBE (*id.* ¶ 27).

Accordingly, the Court's analysis of Fenzl's arguments will proceed based on the three general means alleged in the indictment, which framed the government's trial evidence.

Turning to the substantive law under which Fenzl was convicted, the Court notes that the law here is not in dispute at this stage. To convict a defendant of mail fraud under 18 U.S.C. § 1341, the government must prove: "(1) that the defendant knowingly devised or participated in a scheme to defraud or obtain money or property by means of materially false pretenses, representations, promises, or omissions as described in the indictment; (2) that the defendant did so knowingly and with the intent to defraud; and (3) that the defendant used the United States mail as a carrier." *United States v. Thyfault*, 579 F.3d 748, 751 (7th Cir. 2009). "The elements

of wire fraud under 18 U.S.C. § 1343 directly parallel those of the mail fraud statute, but require the use of an interstate telephone call or electronic communication made in furtherance of the scheme." *United States v. Leahy*, 464 F.3d 773, 787 (7th Cir. 2006). As Fenzl emphasizes in his motion, "materiality of falsehood is an element" of the federal mail and wire fraud statutes. *Nedar v. United States*, 527 U.S. 1, 25 (1999).

In his motion for a judgment of acquittal, Fenzl argues that there was insufficient evidence of both the falsity and materiality of two statements made by Fenzl and his coconspirators that the government relied on for its case.[2] The Court will consider the evidence in support of the falsity and materiality of each statement in turn.

A.    **False and material Certification**

Fenzl's first argument pertains to a certification (the "Certification") in each of the bids submitted to the City, including the one submitted by Urban. The Certification states, in part:

> [T]he undersigned has not entered into any agreement with any bidder (proposer) or prospective bidder (proposer) or with any other person, firm, or corporation relating to the price named in this proposal or any other proposal, nor any agreement or arrangement under which any act or omission in restraining [sic] of free competition among bidders (proposers) and has not disclosed to any person, firm or corporation the terms of this bid (proposal) or the price named herein.

---

[2]  At this juncture, the Court notes that Fenzl does not presently challenge the sufficiency of the evidence regarding the existence of his membership in the charged conspiracy and scheme to defraud, which was extensively argued upon Fenzl's motion for a judgment of acquittal at the close of evidence. He only argues—in a footnote—that the government failed to prove that the intended future conduct agreed upon by the members of the conspiracy included all of the elements of the substantive crime, specifically the falsity and materiality of the statements discussed in this opinion. (R. 110, Def.'s Mot. at 12, n.3.) Fenzl also does not put forth any arguments related to the mailing and interstate wire communications.

(R. 113, Govt. Resp. at 8.) While there is no dispute that Ritter signed the bid containing this Certification, Fenzl challenges the sufficiency of the evidence regarding whether this Certification was false and, if false, whether it was material. (R. 110, Def.'s Mot. at 10.)

Viewing the evidence in the light most favorable to the government, the Court concludes that there was sufficient evidence that this Certification was false in at least two respects. First, the jury heard evidence from which a reasonable juror could conclude there was an "agreement . . . related to the price" between Fenzl and his coconspirators and Roto Industries employees. Fenzl admits that he told a Roto Industries employee "what the costs would be to perform the services at the Urban facilities." (R. 110, Def.'s Mot. at 6, citing Tr. 129-30.) Roto Industries then used the information provided by Fenzl "to establish the price for the bid." (Tr. 99.) Additionally, there was testimony that Ritter and Fakhoury "helped Roto prepare its actual bid document," which Roto sent to Fakhoury, who hand-delivered the Roto bid to the City. (Tr. 396.) There was even testimony that Ritter hand-wrote the bid price on the Roto bid. (Tr. 197-201.) Given this evidence, a reasonable juror could conclude that Fenzl and his coconspirators had an agreement with Roto Industries about at least the cost information used to establish Roto's bid price in violation of the Certification.

Fenzl's arguments to the contrary rely on unsupported interpretations of the Certification. While Fenzl would have the Court believe that the Certification only prohibited an agreement about the "end price" of the bid, (R. 110, Def.'s Mot. at 10), there is no such limitation in the Certification. Instead, it prohibits "any agreement . . . relating to the price" in the proposal. This could include either the costs or markup that went into the final price, or the final bid price itself. Based on the wording of the Certification, it is thus irrelevant that Roto "independently

7

determined what profit it wanted to add on to" the costs if those base costs were agreed to by Fenzl and Roto.

Second, there was also sufficient evidence to find that the Certification was false because "there was an agreement or arrangement . . . in restraining [sic] of free competition." The evidence previously discussed—Fenzl's provision of the base cost to Roto and Ritter and Fakhoury's completion and delivery of Roto's bid—could lead a reasonable juror to conclude there was an "agreement or arrangement" that restrained free competition. In addition to the testimony pertaining to the Roto bid, the jury also heard testimony that Fenzl and his coconspirators determined the final bid price and submitted a bid in the name of Veronica Contracting without the knowledge or consent of its owner. (Tr. 455-56.) In all, there was evidence that Fenzl and his coconspirators were involved in setting the price for four bids submitted to the City—all from different companies—for the Refurb Contract. A reasonable juror could conclude from all of this evidence that Fenzl and his coconspirators had orchestrated an arrangement that restrained competition, thereby making Ritter's Certification false.

Fenzl next argues that even assuming that the Certification was false, there was insufficient evidence to prove the materiality of the false statement. (R. 110, Def.'s Mot. at 12.) The Court disagrees. Fenzl's arguments focus on the lack of evidence pertaining to the actual reliance by the decisionmakers of the Refurb Contract bid on Ritter's false Certification. (R. 110, Def.'s Mem. at 13-14.) However, there is no such requirement to prove materiality in the case of mail and wire fraud. *See United States v. Rosby*, 454 F.3d 670, 674 (7th Cir. 2006) ("Reliance is not, however, an ordinary element of federal criminal statutes dealing with fraud. *Neder* so holds for § 1341 in particular."). Instead, a false statement is material and may

8

potentially establish a violation of wire and mail fraud statutes "if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002). Given this standard, as opposed to the unduly restrictive view of materiality put forth by Fenzl, there was sufficient evidence for the jury to conclude that the false Certification was material. The testimony of three witnesses support this conclusion.

First, two witnesses who were involved in the submission of bids for the Refurb Contract testified to the importance of signing the execution page of the bid to the bid process. The signature on the execution page affirmed the Certification, among other things. Fakhoury testified that the execution page "must be signed for the bid to even be looked at." (Tr. 186-87.) She said that purpose of signing the execution page was to affirm "that we did everything by the book and—and this is a legit bid . . . [and] everything on this bid is true and accurate." (Tr. 187.) Mark Rangel, an employee at Roto, stated that he would not have signed the execution page had he known that Urban was also submitting a bid because the Certification meant "that I have not spoken with anyone else bidding on this particular contract." (Tr. 576.)

In addition to the testimony of Rangel and Fakhoury, the jurors also heard from Investigator Brown of the City's Office of Investigator General. He testified that the purpose of the signature on the proposal page of a bid is for a bidder to convey to the City that the bidder did

not engage in any behavior prohibited by the Certification.[3] (Tr. 297.) He also testified that the Uniqued bid was rejected immediately because it was not signed. (Tr. 294.)

The government claims that this rejection of the Uniqued bid is "the strongest, and indeed conclusive" evidence of the materiality of the Certification. (R. 113, Govt.'s Resp. at 12-13.) The government contends that the rejection of the bid because it lacked a signature shows that the "Certification is not just capable of but actually does influence the decision of the City." (*Id.* at 13.) Fenzl, on the other hand, points out that the signature on the execution page relates to "the entirety of the contract," including other contractual obligations, and not just the Certification. (R. 115, Def.'s Reply at 13-14.) Thus, he argues, the rejection of Uniqued's bid is insufficient to show the materiality of the Certification. (*Id.*)

While the Court does not find the rejection of the Uniqued bid to be the "smoking gun" evidence of materiality as contended by the government, the rejection of the unsigned bid, when viewed in the light most favorable to the government, could be evidence of materiality. Although Fenzl may be correct that the rejection of Uniqued's bid alone does not prove the materiality of the Certification, there is no requirement that a single piece of evidence alone prove materiality. Instead, a reasonable juror could conclude that the falsity of the Certification would have "a natural tendency to influence" or be "capable of influencing" the Refurb Contract decisionmakers based on the rejection of the Uniqued bid and the testimony of Fakhoury, Rangel,

---

[3] Fenzl's main argument is that the only proof of materiality came from Brown, but that his testimony was improper and must be disregarded because he had no personal knowledge about the bidding process involved in this case. (R 110, Def.'s Mot. at 13.) Given the other evidence discussed pertaining to the materiality of the Certification, the Court rejects this argument pertaining to the insufficiency of the evidence. Additionally, while the propriety of some of Brown's testimony is questionable, as discussed below, it was not improper as it pertained to general reasons for the requirement of signatures on bids submitted to the City.

and Investigator Brown. Accordingly, the Court concludes that there was sufficient evidence of both the falsity and materiality of the Certification.

## B.    False and material MBE/WBE Certification[4]

Fenzl's next argument pertains to another certification in Urban's bid. The City required each bidder to identify an MBE and a WBE with which it would enter into subcontracts to purchase goods and services if awarded the Refurb Contract. Urban certified that it would use Chicago Contract Cleaning, an MBE, and Veronica Contracting, a WBE (the "MBE/WBE Certification"). (R. 110, Def.'s Mot. at 19.) The government, however, alleged that Fenzl and his coconspirators did not intend to actually use Chicago Contract Cleaning and Veronica Contracting, and thus "knowingly falsely and fraudulently" certified on Urban's bid that Urban "intended to purchase goods or services from" those companies. (R. 1, Indictment ¶ 27.) In his motion for judgment of acquittal, Fenzl claims that "the government had absolutely no evidence to support a finding" that this statement "was intentionally false when made." (R. 110, Def.'s Mot. at 19.) Instead, Fenzl contends, the evidence merely established a breach of contract by Urban during the performance of the Refurb Contract. (*Id.*)

The Seventh Circuit has made clear that "all the [mail] fraud statute punishes is *deliberate* fraud." *Emery v. Amer. Gen. Fin.*, 71 F.3d 1343, 1346 (7th Cir. 1995) (citation omitted). "Intent to defraud requires a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1005

---

[4]  Fenzl does not challenge the sufficiency of the evidence of the materiality of the MBE/WBE Certification in his motion, and thus the Court only addresses his argument pertaining to the falsity of the MBE/WBE Certification.

(7th Cir. 2004) (internal quotation marks and citation omitted). Thus, "[b]reach of contract is not fraud; only making a promise with the intent not to keep it deserves that epithet." *Perlman v. Zell*, 185 F.3d 850, 852 (7th Cir. 1999).

In support of the sufficiency of the evidence that Fenzl and his coconspirators never intended to purchase goods or services from Chicago Contract Cleaning or Veronica Contracting, the government relies upon circumstantial evidence of fraudulent intent. Because direct evidence of a defendant's fraudulent intent is typically unavailable, "specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself[.]" *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000) (quoting *United States v. LeDonne*, 21 F.3d 790, 794 (7th Cir. 1999)). The government points to three main pieces of circumstantial evidence as support for the jury's finding of fraudulent intent. First, the government contends that the evidence showed that Fenzl and his coconspirators did not deal honestly with the MBE and WBE companies before the bids were submitted. (R. 113, Govt. Resp. at 14.) Similarly, the government next argues that the evidence established that Fenzl and his coconspirators did not deal honestly with the MBE and WBE companies after Urban was awarded the Refurb Contract. (*Id.* at 15.) Finally, the government points to the failure of Urban to file regular reports of MBE and WBE usage as required by the Refurb Contract as circumstantial evidence of the fraudulent intent of Fenzl and his coconspirators. (*Id.* at 17.) Based on the dealings between Fenzl and his coconspirators and the WBE and MBE subcontractors before and after the awarding of the contract, as well as Urban's failure to file related reports, the government argues, a reasonable jury could conclude that Fenzl and his

coconspirators never intended to use the MBE or WBE subcontractors, rendering the WBE/MBE Certification on Urban's bid false.

Reviewing the trial record in this case, the Court finds that this is a close call. Although the parties largely treat the evidence pertaining to the MBE and WBE together, the Court comes to different conclusions regarding the sufficiency of the evidence of the fraudulent intent of Fenzl and his coconspirators with respect to Chicago Contract Cleaning and Veronica Contracting. First, regarding Chicago Contract Cleaning, viewing the evidence in the light most favorable to the government and drawing all inferences in its favor, the Court concludes that there was sufficient evidence for a rational juror to conclude that Fenzl and his coconspirators did not intend to use Chicago Contract Cleaning at the time Urban's bid was submitted. The evidence showed that de Hollister, the owner of Chicago Contract Cleaning, did not cooperate with the plan of Fenzl and his coconspirators to submit three bids in addition to the Urban bid. When Fakhoury faxed de Hollister a blank C-1 form, which is the form used to show that an MBE or WBE and the bidder—in this case Urban—have agreed that the MBE or WBE would provide goods or services under the Refurb Contract, de Hollister refused to sign it. (Tr. 426-27.) She only signed it after the C-1 was completed. (Tr. 426.) She refused, however, to sign the forms for the Uniqued, Roto, and Veronica Contracting bids because she was not familiar with those companies, saying "that's not the way I do business[.]" (Tr. 427.) This caused Ritter and Fakhoury to have to scramble—unsuccessfully—to find another MBE to list for the Uniqued, Roto, and Veronica Contracting bids. (Tr. 319.) The rushed and haphazard manner in which Ritter and Fakhoury sought another MBE could lead a reasonable juror to conclude that they had no intention of actually using the MBE, but only needed one to name on the bids.

13

The jury also heard testimony that although Urban had agreed and certified that Chicago Contract Cleaning would provide a total of $343,756 of goods and services if awarded the Refurb Contract, de Hollister was never notified by Fenzl, Ritter, or Fakhoury that Urban had won the Contract. (Tr. 420.) This was in violation of the terms of the bid, which required Urban to notify Chicago Contract Cleaning that Urban had been awarded the Contract and to enter into a formal contracts or purchase orders within 30 days. De Hollister only learned that Urban was awarded the Refurb Contract when the City sent her a letter asking her to confirm her participation on the contract. (Tr. 430-31.) This complete failure on the part of Fenzl, Ritter, and Fakhoury to even notify de Hollister that Urban received the Contract could be viewed as evidence that they never intended to use Chicago Contract Cleaning if Urban was awarded the bid.[5] There was ample evidence that Fenzl, Ritter, and Fakhoury took many questionable steps to ensure that Urban was awarded the Refurb Contract, and a rational juror could conclude that one such step was certifying that Urban would use the services of Chicago Contract Cleaning even though they had no intention of carrying out that agreement.

In the case of the WBE, Veronica Contracting, however, the circumstantial evidence does not lead to the same conclusion. Instead, the Court finds that the evidence was insufficient to prove fraudulent intent on the part of Fenzl, Ritter, or Fakhoury regarding Urban's use of

---

[5] The Court notes that in his reply brief, Fenzl fails to address the issue of the failure of anyone at Urban to even inform de Hollister that Urban was awarded the Contract, let alone the failure of Urban to obtain any goods or services from Chicago Contract Cleaning as required under the Contract. Instead, Fenzl raises several new arguments not included in his initial motion pertaining to Fenzl's lack of involvement with the execution of the WBE/MBE portion of the Contract and the 2007 utilization report submitted to the City. (R. 115, Def.'s Reply at 16-22.) Because they were first developed in Fenzl's reply brief, these arguments are waived. *See United States v. Adamson*, 441 F.3d 513, 521 n.2 (7th Cir. 2006) (arguments raised for the first time in a reply brief are waived).

Veronica Contracting. Unlike with Chicago Contract Cleaning, the evidence showed that

Caruso, the owner of Veronica Contracting, was notified that Urban was awarded the bid. The

evidence also showed that Veronica Contracting actually completed some work on the Refurb

Contract. (Tr. 455.) That Urban never intended to use Veronica Contracting is not a reasonable

inference to make from this circumstantial evidence.

In support of the sufficiency of the evidence with regard to Veronica Cleaning, the

government points out that Urban stopped using Veronica Contracting before the completion of

the Refurb Contract. (R. 113, Govt. Resp. at 15-16.) Although Veronica Contracting was

supposed to provide $91,530 in services under the agreement in Urban's bid, after Veronica

Contracting completed around $15,000 worth of work, Ritter informed Caruso that Urban no

longer required the services of Veronica Contracting because Urban "could find someone else

cheaper." (Tr. 455.) Contrary to the government's assertions, however, this is not evidence of

fraudulent intent on the part of Fenzl and his coconspirators at the time the Urban bid was signed.

Rather, this was evidence that Urban breached the Refurb Contract. Unfortunately for Fenzl,

though, this finding does not impact the Court's conclusion that the MBE/WBE Certification was

false because, as discussed above, a reasonable juror could have found that Fenzl and his

coconspirators never intended to use Chicago Contract Cleaning, thereby making the MBE/WBE

Certification false with respect to Chicago Contract Cleaning.

### C.    Other means

Finally, the government argues that Fenzl's conviction must stand because it is supported

by other means not challenged by Fenzl in his motion for a judgment of acquittal. The first claim

put forth by the government in the indictment is that Fenzl and his coconspirators "deceiv[ed] the

City of Chicago officials about the number of legitimate, competitive bids submitted" for the Contract by orchestrating—through various materially false pretenses, representations, and promises and concealment of material facts—a number of sham bids. (R. 1, Indictment ¶ 25.) The government correctly points out that Fenzl failed to challenge the sufficiency of the evidence pertaining to this claim in his initial motion and instead chose to focus on the sufficiency of the evidence pertaining to the falsity and materiality of the previously discussed certifications in Urban's bid. (R. 113, Govt. Resp. at 5.) While Fenzl admits as much in his reply, he argues that the government failed to prove the materiality of "any allegations of fraud premised on the number of bids submitted." (R. 115, Def.'s Reply at 3, n.1, 4-5.) This is one of a number of arguments Fenzl presented for the first time in his reply brief, and therefore waived. Even if this argument was not waived, however, it would be futile as it is well-established that the verdict must be upheld if the evidence was sufficient with respect to one of the means identified in the indictment. *See Turner v. United States*, 396 U.S. 398, 420 (1970) ("The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged.") (citations omitted). As the Court has already concluded that, when considering all of the evidence in the light most favorable to the government, a rational juror could have returned a guilty verdict based on the certifications in Urban's bid, Fenzl's motion for a judgment of acquittal must be denied.

## II.     Motion for a new trial

Fenzl alternatively moves for a new trial based on the testimony of Investigator Brown. Under Federal Rule of Criminal Procedure 33, a court "may vacate any judgment and grant a new

trial if the interest of justice so requires." Fed. R. Crim. P. 33(b)(1). Relief under Rule 33 is

appropriate in situations in which the "substantial rights of the defendant have been jeopardized

by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989).

An evidentiary error, however, only requires reversal if the error had a "substantial and injurious

effect or influence on the jury's verdict." *United States v. Redditt*, 381 F.3d 597, 601 (7th Cir.

2004).

Fenzl argues that the Court should grant a new trial based on the testimony of Investigator

Brown, which he contends was admitted in error and had a prejudicial effect upon the jury's

verdict. (R. 110, Def.'s Mot. at 21.) Fenzl specifically points to two portions of Investigator

Brown's testimony that he argues should not have been admitted. First, Fenzl objects to

Investigator Brown's testimony regarding the meaning and purpose of the Certification (*id.* at

13):

> Q: What is the purpose of this page [containing the Certification]?
>
> A: The purpose of this page is for—
>
> Mr. Campbell: Objection, Judge.
>
> The Court: Okay. Overruled. You can answer.
>
> A: The purpose of this page is for the bidder who's submitting a bid to the City for a contract opportunity to let the City know that they are not engaged in any sort of cooperation or conspiracy with any other companies, that they were not submitting the bid of their own volition, and they did nothing to restrain competition on this particular bid, that they filled this out by themselves and that they didn't work with anyone else.

(Tr. 296-97.)

Second, Fenzl objects to Investigator Brown's testimony regarding the importance of the Certification to the City (*id.* at 22):

> Q:    If the City had known that Steven Fenzl and Doug Ritter had communicated with other companies that submitted bids for the refurb contract, would the City have awarded to contract to Urban?
>
> Mr. Campbell:       Objection, Judge.
>
> A:    No.
>
> The Court:    The objection is overruled. The answer can stand.

(Tr. 402-403.) The Court will first consider whether this testimony was admitted in error, and second, the prejudicial impact of the testimony if erroneously admitted.

### A.    Admission of Investigator Brown's testimony

Fenzl asserts that this testimony by Investigator Brown should not have been admitted because it "was not based on personal knowledge, constituted rank speculation, and improperly invaded the province of the jury." (R. 110, Def.'s Mot. at 21.) The government contends the testimony was properly admitted under Federal Rules of Evidence 601, 602, and 701. (R. 113, Govt. Resp. at 19.) While Investigator Brown's testimony was questionable in several ways, the Court concludes that it was properly admitted.

First, Investigator Brown's testimony clearly meets the requirements of Rules 601 and 602. Rule 601 provides that "[e]very person is competent to testify." Fed. R. Evid. 601. Under Rule 602, a witness may not testify to a matter unless that witness "has personal knowledge of the matter." Fed. R. Evid. 602. Contrary to Fenzl's arguments, Investigator Brown's testimony was based on his personal knowledge of the City of Chicago's bid process gained through his experience and training as an investigator for the City of Chicago's Office of Investigator

18

General. (Tr. 283-84) Over the course of his seven years as an investigator, he had been trained to investigate fraud, including fraud relating to City contracts. (*Id.*) He thus had personal knowledge regarding the City's bid process, including the purpose and importance of the documents involved in the bid process.

Fenzl correctly points out that Investigator Brown did not have any personal involvement with the decision made by the City regarding the awarding of the Refurb Contract. (R. 110, Def.'s Mot. at 23.) That Investigator Brown was not involved in the decisionmaking process for the Refurb Contract, however, does not mean that he did not have knowledge about the City's contracting process. Investigator Brown was familiar with the City's rules and regulations involved in the contracting process, and thus could properly testify about the importance of the various documents submitted with a bid package to the City.

Investigator Brown's testimony was also properly admitted as opinion testimony, not "rank speculation" as Fenzl contends, under Rule 701. Rule 701 permits a lay witness to testify "in the form of opinions or inferences" if the opinions or inferences are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Fenzl argues that Investigator Brown's testimony does not pass muster under Rule 702 because the testimony was not based on Investigator Brown's "perception" and offered a legal conclusion, thus rendering the opinion "unhelpful" to the jury.

Fenzl's first challenge to Investigator Brown's testimony is unsuccessful. Investigator Brown offered his opinions regarding the importance and meaning of the Certification based on

the knowledge of the City bid process he had gained during his time as an investigator. He had experience investigating fraud, interviewing contract decisionmakers, and reviewing bid documents, and offered his opinion based on observations culled from those experiences. Although he did not have personal knowledge of the City's decisionmakers' thought processes for the awarding of the Refurb Contract, he did have personal knowledge of the types of misrepresentations that would influence or affect the decisionmakers' ultimate decision from his years of investigating fraud in City contracting.

The second argument put forth by Fenzl, that the testimony was "unhelpful" because it offered a legal conclusion and thus improperly invaded the province of the jury, is more persuasive but ultimately unavailing. (R. 110, Def.'s Mot. at 24-25.) Determining whether an opinion is helpful "requires balancing the benefits of the opinion against its cost." *See* Charles A. Wright & Victor J. Gold, 29 Federal Practice & Procedure § 6255 (1st ed. 2010 supp.) Here, the benefit of Investigator Brown's testimony regarding the purpose of the Certification was to provide the background and function of the Certification. Investigator Brown's testimony regarding the importance of the Certification to the City decisionmakers provided the benefit of summarizing his previous testimony regarding the City bid process and applying it to the facts of this case. Both opinions were clearly helpful to the jury's determination of the materiality of the Certification.

On the other hand, Fenzl argues that the "cost" of admitting Investigator Brown's opinions was particularly great in this case because the opinions offered a legal conclusion. He relies upon *United States v. Noel*, in which the Seventh Circuit held that a detective's testimony that images on a computer met the federal definition of child pornography was inadmissible

opinion testimony. 581 F.3d 490, 496 (7th Cir. 2009). In *Noel*, the Seventh Circuit found that the detective's testimony "amounted to nothing more than a statement that the photos were illegal." *Id.* Importantly, the detective provided "no explanation for [her] testimony, but instead offered only conclusory statements." *Id.* The Seventh Circuit concluded that because the jury was capable of making the determination that the photos met the federal definition of child pornography on its own, the detective's testimony "was unhelpful to the jury as lay testimony." *Id.* at 497.

In this case, the Court finds that the benefit of Investigator Brown's testimony pertaining to the purpose of the Certification outweighs its cost. While it was obviously relevant to the materiality issue, the testimony was sufficiently distanced from the ultimate legal question that it did not invade the province of the jury. *See* 29 Federal Practice & Procedure § 6255 ("[T]he balance shifts in the direction of admitting lay opinion as the distance increases between the opinion and the ultimate issues."). Investigator Brown's opinion as to what sort of conduct the Certification was meant discourage is very clearly distinguishable from the testimony of the detective in *Noel*, who "in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so.'" *Noel*, 581 F.3d at 497. Fakhoury and Rangel offered similar testimony pertaining to the purpose of the Certification, to which Fenzl does not object as improper.

Balancing the costs and benefits of the admission of Investigator Brown's testimony pertaining to the importance of the Certification to the Refurb Contract decisionmakers, however, is a more difficult call. The opinion that the City would not have awarded the Contract to Urban had it known the Certification was false was precariously close to stating the legal conclusion

that the Certification was material to the Refurb Contract decisionmakers. The opinion in some ways took the place of the factual basis of the opinion, thereby making it difficult for the jury to draw its own conclusions or determine what weight to give the opinion. Nevertheless, the Court concludes that it was still properly admitted because Fenzl had the opportunity to effectively reveal the deficiencies in the adequacy of Investigator Brown's perception. *See* 29 Federal Practice & Procedure § 6255 ("The second factor important to balancing the costs and benefits of lay opinion is the extent to which those costs can be contained by cross-examination and argument.") It was clear to the jury that Investigator Brown was not personally involved in the decisionmaking process for the awarding of the Refurb Contract based on the following testimony elicited during the cross-examination of Investigator Brown:

> Q: You were not involved in any respect in the handling of this bid for the refurb contract in January of '05, right?
>
> A: That's correct.
>
> Q: You were not involved in any discussions whatsoever with anybody in procurement at the time these bids were being considered, correct?
>
> A: That's correct.
>
> Q: You don't know if they would or would not have considered Urban's bid had they known that? You don't know what these people would have done, do you?
>
> A: That's correct.

(Tr. 407.) Additionally, unlike in *Noel*, Investigator Brown had explained the basis for his opinion over the course of his testimony, which permitted the jury to determine the proper weight to give his opinion. Accordingly, although the Court questions the propriety of this type of

presentation of testimony by the government, the Court concludes that Investigator Brown's testimony was not admitted in error.

## B.     Prejudice

Finally, even if Investigator Brown's testimony was admitted in error, there is not "a reasonable possibility that [the] error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006). First, as discussed above, Fenzl's arguments pertaining to the erroneous admission of Investigator Brown's testimony rely upon a faulty understanding of materiality in the context of mail and wire fraud. The government need not have proved that the misrepresentations were actually relied upon by the City decisionmakers, but only that they were capable of influencing the decisionmakers. *Rosby*, 454 F.3d at 673-74. Second, as the Court just discussed, the cross-examination of Investigator Brown effectively mitigated any possible prejudice caused by his testimony regarding the importance of the Certification. Finally, as discussed above, there was other evidence pertaining to the materiality of the Certification that supported the jury's verdict. Additionally, the four counts in the indictment were based on a single scheme to defraud the City through multiple means, and Officer Brown's testimony to which Fenzl objects pertains to only one of the means outlined in the indictment. Thus, because Investigator Brown's testimony was properly admitted, or if admitted in error, did not have a reasonable possibility of having a prejudicial effect on the verdict, Fenzl is not entitled to a new trial.

## CONCLUSION

For the foregoing reasons, Fenzl's motion for a judgment of acquittal or a new trial (R. 110) is DENIED.

Entered: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated:** May 24, 2011